The second case on our calendar, UBS Securities v. Leitner. Thank you. Go ahead, Mr. Blusty. May it please the Court, my name is Sam Blusty, Dunnington, Bartholow & Miller, Attorneys for Defendant Appellant Gregory Leitner. Your Honors, Mr. Leitner had the courthouse door slammed shut on him in gross violation of his due process rights. Those rights were violated when Mr. Leitner was prohibited from bringing his claim in his selected forum, FINRA, as well as when the District Court summarily entered a permanent Mr. Blusty, maybe you can help me understand this, just a series of factual questions that I'm interested in having your views on. Your client and UBS Securities never entered into an arbitration agreement, is that right? So there's a caveat to that. Those two parties do not have a formal written agreement with each other, however UBS Securities is a FINRA member and therefore bound by the FINRA rules, including the relevant arbitration clause. And you're claiming that your client is a third-party beneficiary of that agreement? Essentially, yes. Under FINRA Rule 12200, he is a customer because he purchased a product, MLPL, a debt security of UBS on a United States exchange, and there were fees collected in exchange with that. Now, the allegations before the District Court were that Mr. Leitner paid a series of fees. These fees are claimed by UBS to be so-called embedded fees, and without any justification they say that they should avoid consideration, avoid discovery, avoid litigation. So if I buy a mutual fund from Vanguard or one of those companies that markets mutual funds, I'm their customer? It depends on the facts. In this instance... If I buy it on an open exchange from somebody who's trying to sell the shares, would I become a customer of the issuer of that mutual fund, or the proprietor of that fund? Yes, depending on the offering documents, depending on whether you paid fees, depending on whether... Well, there are always fees built into these products, or not always. Many of them have fees built into the product, right? I can't speak as to all of the products. I'm certain that some products do have fees, but with respect to this specific case, Mr. Leitner's allegations are, yes, fees were paid by him to UBS. Well, he didn't write a check to UBS for that. That's not the allegation, right? The allegation is that the price of the security, when you sell the security, there's some deduction or commission that goes for the fees. There were various fees. There were calculation fees. There were management fees. There was a fee at the very end when the security was redeemed. Whether or not Mr. Leitner wrote a check, I don't think is an appropriate part of the calculus. I think the fact that he alleges and can prove that these fees were, in fact, paid, whether through the purchase price of the security or through dividends or whatnot, they were paid. Mr. Bluffstein, let me go back to just the basic facts of this arrangement. Did your client have a brokerage account with UBS? He did not have a brokerage account with UBS. He didn't purchase any securities, UBS securities, from MLPL. UBS AG, which is a non-party issue to the security, the plaintiff herein, Apolli UBS Securities LLC, is the United States domestic entity that underwrote and marketed those securities in the United States. But the purchase you said was made, what did he do? He called up Fidelity. I don't know how he executed the trade, whether it was a phone call or over the internet. You said that it was purchased through, if I heard you correctly, a United States exchange. Yes. It wasn't even purchased directly. Judge Lynch's question where you call up Vanguard and you say, I want the Vanguard 500 fund. He essentially purchased it, not directly from UBS, but he purchased it on an exchange. In other words, it wasn't even a direct, there's no way to characterize him in the ordinary use of the word as a customer in that circumstance. I would disagree. Mr. Leitner had what's called a self-directed account at Fidelity. He's a sophisticated attorney and this debt security, MLPL, was issued and according to the offering documents and other documents produced by UBS, sold directly to investors. Now yes, like almost all publicly traded securities, it was sold on the NYSE, I believe it was the ARCA exchange when it was active. I didn't follow what you just said. Could you just say it again? Certainly. The security was traded on a public exchange. Right. I wanted to buy that security, even though it was issued by UBS or its various brothers and sisters. How would I go, I call up my broker and I say, I want to buy this mutual fund and what does the broker do? He then puts in, somebody is selling it or does he buy it directly from UBS? I gather it depends on whether they're purchasing directly from shares held by UBS or whether they're being sold on the actual market. There's a difference. It seems to me of what they're a customer of. I can understand an argument that if I called, again using Judge Lynch's vanguard, if I called an S&P 500, I could see that I might be a customer of Vanguard. But if the purchase is bought on an exchange where somebody, where X who owns it is selling it to Y through an exchange, I don't see how they become a customer of UBS. I think that by imposing a middleman to the transaction, they try avoiding this definition of customer, but that is not in the only sense where a customer relationship can be found. For instance, there are other products, automobiles and whatnot, where if you purchase an automobile through a dealer, that doesn't divest you of customer status if you want to arbitrate against the auto manufacturer. In this instance, the product is a UBS product. It was purchased, yes, through an exchange, but that does not eliminate Mr. Leitner's ability after discovery to... If I purchase an automobile from an automobile dealer, I would be a customer of the automobile dealer. I wouldn't necessarily regard myself as a customer of the manufacturer of the car. Depending on the agreement. Whether I have any rights against the manufacturer of the car really depends on what the written work says. It's solely dependent on the agreement. Here, rule 12200 defines customer only in the negative as not a broker and not a dealer. In this instance... But we've defined customer in a series of cases, so that's what you have to deal with, right? Yes, and I'd rather refer to the briefing, the Abar, Turnberry and Roscos cases. Two of those cases were after trial and the other one, Abar, the principal case... Well, whether after trial or not, the standard is whether you purchased goods or services or had an account. We've established he didn't have an account with UBS, so the question is whether he purchased goods or services from UBS, UBS Securities, the entity with whom he is trying to arbitrate. UBS Securities is the domestic entity that underwrote and sells these securities here in the United States. They shouldn't be able to insulate themselves simply by saying no one can purchase directly from us, therefore no one... Why not? If you sell something and have an initial public offering, in effect, and now it's out there and anybody who has bought it can sell it to somebody else, how do you become a customer of the original offeror of the securities? I view it as a direct transaction. With specific respect to securities, you can only purchase them through an exchange. That's exactly what Mr. Leitner did. He bought them from UBS. They're the issuer. Can I ask you about a procedural question? You're aggrieved about your inability to obtain from Judge Swain discovery before she issued her order. What evidence... What would that hearing consist of? What would the evidence consist of in discovery, possible discovery? This connects also to the question. You're also concerned that she didn't give you a hearing, an evidentiary hearing. Correct. What's the evidence that might be in dispute? At bare minimum, the record contains a lot of UBS public disclosure documents as well as FINRA documents specifically relating to Rule 12200. You wouldn't need a hearing for that, or you wouldn't need discovery for that? I'm not conceding that. I think that we would need to see what those documents mean. Someone from UBS to explain what these... They were not available to the judge? The documents themselves? Yeah. They were, but we identified specific persons at UBS who dealt with the security who made these public statements. We also identified FINRA guidance regarding Rule 12200 and customer status specifically. All right. You've reserved some time, and we'll hear from opposing counsel. Thank you. Thank you, Your Honor. Your Honors, David Goldberg of the law firm Kattenmuth and Roseman for Appellee UBS Securities. Your Honors, four years ago, this circuit adopted a bright line rule, and those are words from the Abar decision, to determine who qualifies as a customer for purposes of FINRA Rule 12200. And Abar held that a customer is someone who holds an... Sometimes we think a rule is bright, and then it turns out that it's a little blurrier than we wished. I think it's pretty bright here, Your Honor. And what the circuit held was someone who holds an account or who purchases a good or service qualifies as a customer and is entitled to arbitrate as opposed to being relegated to judicial remedies. What Abar further said is that customer status should reflect the reasonable expectations of the FINRA member so that they can handle their risk accordingly. And it should... In the ordinary course, it can be readily applied to undisputed facts. That's what we have here. The facts are undisputed, and they can be readily applied. Mr. Leitner meets neither part of Abar's test. He did not hold a UBS account. That's been conceded. And he bought an MLPL from Fidelity, his self-directed brokerage company, bought $750,000. As Mr. Bloustein said, he's a sophisticated investor, a corporate attorney, and he made a large purchase. His remedies are judicial, if at all. Let me ask you about that very question. Why isn't the question of arbitrability a matter that should be decided at the threshold by the FINRA system? When the parties clearly and unmistakably delegate the issue of arbitrability to an arbitrator, Your Honor is correct, it would be handled by an arbitrator. Here there is no arbitration agreement, and this court has held that the parties have not clearly and unmistakably given that issue to the arbitrators. But we just don't reach that kind of question. Correct. That's a gateway question that this court holds in the absence of an agreement to arbitrate arbitrability. The FINRA rules do not say, I take it, that whenever anybody files a FINRA claim against a member, the member has agreed that the arbitrability will be decided by FINRA. Correct. And this circuit held in the Bensidun case that issues of arbitrability are decided by the courts. So we believe that issue is well settled. Let me ask you somewhat of a practical question. This seems to be in reverse. It's usually you who are arguing in favor of arbitration, and the other side in these kinds of cases is arguing against it. This is the reverse. Why do you not want arbitration? The brokerage industry embraces arbitration as a cost-effective means to resolve disputes with its customers. And that's a deal that we made with our customer base. The SEC endorsed it after the Shearson-Lehman case in 1987, which said that mandatory arbitration with customers was an appropriate means of dispute resolution. But why don't you put it here? I'm just asking a practical question. I'm not passing any judgment on validity of the argument. No, no. I'm just curious. Well, I think it goes to Judge Lynch's question, which is that the construction of customer that Mr. Blaustein has urged has no limiting principle. Every mutual fund holder, every ETF or ETN holder would be entitled to arbitrate with a brokerage firm that was the initial— I don't think there were written opinion against you. I'm just asking a practical question. Why don't you want to arbitrate? Several reasons, Your Honor. In all candor, we say that Mr. Leitner is relegated to judicial remedies. Were he to pursue a lawsuit in the wake of an affirmance of Judge Swain's decision, we believe any such lawsuit would be subject to dismissal on the grounds of statute of limitations. He has a Section 11 claim in his arbitration, even though the IPO, in this case, the initial issuance was in 2010. So the statute proposed would clearly bar that in the court, we believe. And that's probably a reason that the corporate attorney at the heart of this suit chose arbitration instead of a judicial remedy. Now, we could argue, I suppose, in an arbitration that a panel of three FINRA arbitrators should give effect to Section 11's statute of repose. In my practical experience, arbitration panels frequently do not. There's no dispositive motion practice in FINRA arbitration.  So you get, you know, to present all of your evidence and the chips are all laid out on the table. And those are some of the strategic reasons I would suggest that Mr. Leitner saw fit to try and bring an arbitration here. We believe his remedies are judicial in this case. Is the record clear as to who gets whatever these fees are that Mr. Leitner is talking about? It is clear. Judge Swain received all the evidence and there were manifold exhibits that Mr. Leitner and his counsel submitted. And she went through that and included the prospectus. And that lays out how the fees are. And it was exactly as Your Honor anticipated. It is a price. It's appellate appendix at 313, appendix at 312 is a declaration from Mr. Leitner, which was received. And it conceded that he bought his MLPL from Fidelity and it attaches to it a brokerage statement which says this is the redemption price at $12.9. Some of that $12.9 goes from Fidelity to DTC to UBS Securities and on to the issuer UBS AG, which had made a loan against this product. So the record is clear. Ultimately the fees belong to the Swiss issuer. Correct. Which is not a FINRA member. Your Honors, if there's no further questions, we'll rest on our briefs and cede the rest of our time back to the panel. Mr. Blousy, you've reserved two minutes. Very briefly, Your Honor. Very briefly, Your Honors. In Judge Swain's decision granting the preliminary injunction, she makes a finding and this is on Special Appendix page 5, that Leitner makes no allegations that he ever paid a fee to UBS. That's simply wrong. Leitner did allege that he paid fees to UBS. Whether or not that's disproven after discovering a trial, perhaps, but that is the allegation. That's clearly an incorrect finding of fact. With respect to the Bright Line Rule, we do not argue that this is an inception-based question for the court to decide whether an agreement was made. This is a special circumstance where the FINRA rules impose mandatory arbitration when requested by a customer. UBS Securities LLC is a party to that arbitration agreement. It is a written agreement for purposes of the Federal Arbitration Act. The Abar case did not deal with anything close to this. This was a foreign investment made by a family overseas involving a UK entity that in turn had some work done by an office here in New York. The member there had no affiliation of any kind nor were there any similar type allegations. What is the good or service that Mr. Leitner purchased from UBS Securities? Mr. Leitner, as we allege, bought MLPL because it was advertised by UBS publicly that it was a proper investment. He didn't buy it from them. He bought it on the exchange. It's a UBS Securities product. We allege that that makes him a customer under the Rule 12201. But that's a legal question. That's not something you need a hearing about. We all agree what happened. The question is, does that, as a matter of law, make him a customer? We say that it does. And we also say that it was for FINRA to make that initial determination. Where do you get that? Because as I understand the rule, it's pretty much as your adversary, Mr. Goldberg, stated it, that ordinarily the threshold question of arbitrability is for the court unless the arbitration agreement specifically and unequivocally says arbitrability is a question for the arbitrator. So where in the FINRA rules does it say that if you file an arbitration demand with FINRA, it is for the arbitrator to decide whether there is an arbitrability? UBS's complaint does not allege this is an issue of arbitrability. It alleges this is a question of definition, whether it's a customer status. Customer status is what determines whether it's arbitrable. But customers are FINRA definition, and the FINRA panel has the sole authority to determine those definitional questions. And is there authority for that? Is that we ever held, or any other court ever held, that whether you're a customer? I mean, in Avar, we decided who was a customer. We included all of the briefing in the Avar and Turnberry cases to the district court, and this— Okay, so whether that determines it, we may have done it wrongly, or we may have done it because it wasn't raised. I'm asking you, is there a case that says that whether somebody is a customer is for FINRA to decide, not for the courts to decide? I have not seen a holding that specifically says exactly that. We've advanced some state law cases where Rule 12409 was invoked, and those were cases after arbitration. It's not exactly the same fact pattern, but we've advanced the most close cases that we can find. Thanks very much, Mr. — Thank you very much, Your Honors. Rule reserve decision.